J-S07023-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JOSHUA JOHN FRANK ROMANELLI | : | No. 685 MDA 2025 |

Appeal from the Order Entered April 25, 2025
In the Court of Common Pleas of Adams County Criminal Division at
No(s):  CP-01-CR-0001468-2024

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.:                    **FILED JUNE 30, 2026**

The Commonwealth of Pennsylvania appeals from the April 25, 2025 order entered in the Court of Common Pleas of Adams County that granted the *omnibus* pre-trial motion filed by Joshua John Frank Romanelli ("Romanelli").[1]  We vacate the order and remand the case for further proceedings.

The trial court set forth the following findings of fact:

1.     Trooper [Jeffrey] Allen [("Trooper Allen")] is employed with the Pennsylvania State Police and is stationed at the

---

[1] Pennsylvania Rule of Appellate Procedure 311(d) permits the Commonwealth to "take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution."  Pa.R.A.P. 311(d).  In its May 5, 2025 notice of appeal, the Commonwealth certified that the trial court's order that granted Romanelli's *omnibus* pre-trial motion would substantially handicap the prosecution of this case.  Commonwealth Notice of Appeal, 5/5/25.

Gettysburg Barracks. Trooper Allen has been a Pennsylvania State Police Trooper for approximately [six] years.

2. Trooper Allen [] received training dealing with Vehicle Code violations, traffic stops[,] and [driving under the influence of alcohol or a controlled substance ("DUI")] investigations. Trooper Allen has handled approximately 300 DUI investigations, with approximately half of those investigations involving suspected [use of] marijuana.

3. Trooper Allen is certified in Standard Field Sobriety Testing [("SFST")] and Advanced Roadside Impaired Driving Enforcement [("ARIDE")].

4. On June 26, 2024, at approximately 8:50 a.m., Trooper Allen was on routine patrol [traveling] northbound on [United States] Route 15 in Adams County, Pennsylvania.

5. Trooper Allen followed a blue Ford Edge [("the vehicle")] for approximately [four] miles travelling in the left lane [of the roadway] when the right lane [of travel] was available. There were no vehicles observed in the right lane [of travel] in front of the vehicle.

6. Trooper Allen stopped the vehicle for a suspected violation of [] Pennsylvania Vehicle Code [Section 3313(d)(1) – restrictions on use of limited access highways – driving in right lane,] a summary offense.

7. Trooper Allen approached the driver['s] side of the vehicle and identified [Romanelli] as the driver. There were three other passengers in the vehicle. Trooper Allen observed [Romanelli] to have bloodshot and glassy eyes.

8. Trooper Allen asked [Romanelli] to exit the vehicle because he wanted to separate [Romanelli] from the passengers in the vehicle "to find out what was going on[."]

9. Trooper Allen was wearing a body camera during his interaction with [Romanelli]. The body camera footage was admitted into evidence as Commonwealth [E]xhibit 1 by

stipulation.[2]   A review of the body camera footage established the following:

8:54:00 hours - Trooper Allen approached the vehicle and had contact with [Romanelli]. Trooper Allen advised [Romanelli] why he stopped him.   [Romanelli] provided Trooper Allen with his [driver's] license and [vehicle] registration.

8:54:45 hours - Trooper Allen asked [Romanelli] to exit the vehicle.

8:55:07 hours - Trooper Allen asked [Romanelli] "were you smoking this morning, your eyes are bloodshot and glassy[."  Romanelli] responded he smoked marijuana that morning at approximately 7:30 a.m. and had a [] medical marijuana card [issued by the State of Maryland].

10.   Body camera footage also showed [Romanelli] wearing glasses.

11.   Trooper Allen subsequently placed [Romanelli] under arrest for suspected [DUI].

Trial Court Opinion, 4/25/25, at 1-2.

On July 22, 2024, Romanelli was charged with DUI – Schedule I controlled substance, DUI – general impairment due to a drug or combination of drugs, DUI – metabolite of Schedule I controlled substance, and restrictions on use of limited access highways – driving in right lane as a result of the traffic stop that occurred on June 26, 2024.[3]  On March 18, 2025, Romanelli filed an *omnibus* pre-trial motion seeking to suppress all evidence obtained

_____

[2] The video recording from Trooper Allen's body camera (Commonwealth Exhibit 1) was not provided as part of the certified record.

[3] 75 Pa.C.S.A. §§ 3802(d)(1)(i), 3802(d)(2), 3802(d)(1)(iii), and 3313(d)(1), respectively.

from the traffic stop on the ground that Romanelli was subjected to an illegal detention, unsupported by reasonable suspicion of criminal activity, when he was ordered to exit the vehicle and was subsequently asked about his use of marijuana. Romanelli argued that "Trooper Allen began an independent investigation when he [o]rdered [Romanelli] outside of the vehicle" and that Trooper Allen did not have reasonable suspicion "to begin the new investigative detention" based solely on Trooper Allen's observation of Romanelli's bloodshot, glassy eyes. *Omnibus* Pre-Trial Motion, 3/18/25, at ¶18.

After conducting a hearing on Romanelli's *omnibus* pre-trial motion on April 15, 2025, the trial court took the matter under advisement. On April 25, 2025, the trial court granted Romanelli's *omnibus* pre-trial motion. This appeal followed.[4]

The Commonwealth raises the following issue of our review:

Did the [trial] court err when it granted [Romanelli's] *omnibus* pre[-]trial motion to suppress evidence because it concluded that a summary vehicle traffic investigation transformed into a DUI investigation which required reasonable suspicion when Trooper Allen asked [Romanelli] within 67 seconds of initially approaching the vehicle whether [Romanelli] had smoked marijuana?

Commonwealth's Brief at 6 (extraneous capitalization omitted).

---

[4] The Commonwealth and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925. Pa.R.A.P. 1925. In its Rule 1925(a) opinion, the trial court stated that it relied upon the rationale set forth in its opinion that accompanied the suppression order. Trial Court Opinion, 6/5/25.

Our standard of review in addressing a trial court's order granting a suppression motion is well-settled.

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.
>
> Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings[. We] maintain *de novo* review over the suppression court's legal conclusions.

***Commonwealth v. Ross***, 297 A.3d 787, 791 (Pa. Super. 2023) (citation omitted). "[It] is within the suppression court's sole province as fact[-]finder to pass on the credibility of witnesses and the weight to be given their testimony." ***Id.*** (original brackets omitted).

The Commonwealth asserts, and Romanelli does not dispute, that Trooper Allen had probable cause to effectuate a legal traffic stop of Romanelli for a violation of Section 3313(d)(1). Commonwealth's Brief at 14; ***see generally*** Romanelli's Brief at 6-9. The Commonwealth contends that Trooper Allen was not required to possess reasonable suspicion that Romanelli was engaged in criminal activity when he asked Romanelli to exit the vehicle because Trooper Allen's intent was "to separate [Romanelli] from the other passengers in the [vehicle `]to find out what was going on'" Commonwealth's Brief at 12, 14. The Commonwealth asserts that, in carrying out the mission

- 5 -

of the lawful traffic stop, a police officer may "ask the detainee a moderate number of questions to try and obtain information confirming or dispelling the [police] officer's suspicions" provided that the questioning does not prolong the lawful stop. *Id.* at 13, 15 (original quotation marks, citation, and ellipsis omitted). The Commonwealth contends that "[w]ithin 22 seconds of asking [Romanelli] to exit the vehicle, Trooper Allen asked [Romanelli] if he had smoked [marijuana] earlier since [Romanelli's] eyes were bloodshot and glassy." *Id.* at 15. The Commonwealth argues that Trooper Allen's questioning of Romanelli occurred during the mission of the lawful traffic stop and did not prolong the traffic stop. *Id.* at 15-16 (stating, "[a] quick question [asked] within 67 seconds of approaching the vehicle, [and] asked before [Romanelli's vehicle] registration and [driver's] license were run, did not extend or prolong the traffic stop"). The Commonwealth asserts that Trooper Allen's questioning of Romanelli regarding the use of marijuana did not transition the traffic stop into a new investigative detention requiring separate reasonable suspicion of criminal activity. *Id.* at 15. We agree.

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and Article I, Section 8 of the Pennsylvania Constitution protect a person from unreasonable searches and seizures by police in areas where the person has a reasonable

expectation of privacy.[5]  ***Commonwealth v. Barr***, 266 A.3d 25, 39 (Pa. 2021).  "To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty." ***Ross***, 297 A.3d at 792 (citation omitted).  The three forms of police-interaction have long-been defined as: (1) a mere encounter, which can be any formal or informal interaction between a law enforcement officer and a citizen and carries no official compulsion to stop or respond, requires no level of suspicion, (2) an investigative detention, which, by implication, carries an official

_____

[5] The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

The Pennsylvania Constitution provides,

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA CONST. art. I, § 8.

compulsion to stop and respond, requires reasonable suspicion that criminal activity is afoot, and (3) custodial detention, which occurs "when the nature, duration, and conditions of an investigative detention become so coercive as to be, practically speaking, the function equivalent of an arrest," requires the showing of probable cause to support the arrest. *Commonwealth v. Graham*, 353 A.3d 225, 230 (Pa. Super. 2026).

> A police officer has the authority to stop a vehicle when he or she has reasonable suspicion that a violation of the [V]ehicle [C]ode has taken place, for the purpose of obtaining necessary information to enforce the provisions of the [Vehicle Code]. However, if the violation is such that it requires no additional investigation, the [police] officer must have probable cause to initiate the stop.

*Commonwealth v. Brown*, 64 A.3d 1101, 1105 (Pa. Super. 2013) (citations omitted), *appeal denied*, 79 A.3d 1096 (Pa. 2013); *see also Commonwealth v. Chase*, 960 A.2d 108, 113 (Pa. 2008) (stating, "[t]he Fourth Amendment does not prevent police from stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if it is a minor offense"); *Commonwealth v. Prizzia*, 260 A.3d 263, 267 (Pa. Super. 2021) (stating, "Pennsylvania law makes clear that a police officer has probable cause to stop a motor vehicle if the officer observes a traffic code violation, even if it is a minor offense").

> In the context of a traffic stop, the United States Supreme Court held that the duration of police inquiries is determined by the seizure's "mission" - to address the traffic violation that warranted the stop and attend to related safety concerns. A stop becomes unlawful when it lasts longer than is necessary to complete its mission, the rationale being that the authority for the seizure ends

when tasks tied to the traffic infraction are - or reasonably should have been - completed. The [United States] Supreme Court elaborated that the critical question is not whether the inquiry occurs before or after the [police] officer issues a ticket, but whether it prolongs[,] *i.e.*, adds time to[,] the stop.

***Ross***, 297 A.3d at 792 (citations, quotation marks, ellipsis, and original brackets omitted), *relying on* ***Rodriguez v. United States***, 575 U.S. 348 (2015).

Beyond determining whether to issue a traffic ticket, [a police] officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

***Rodriguez***, 575 U.S. at 355 (citations, quotation marks, and original brackets omitted); *see also* ***Commonwealth v. Sloan***, 303 A.3d 155, 164 (Pa. Super. 2023); ***Graham***, 353 A.3d at 231; ***Ross***, 297 A.3d at 792.

Our Supreme Court has expressly recognized that [a police] officer conducting a valid traffic stop may order the [driver or other] occupants of a vehicle to alight to assure his [or her] own safety. Once the primary traffic stop has concluded, however, the [police] officer's authority to order either the driver or occupant from the car is extinguished. Thus, if the [police] officer directs or requests the occupants to exit the vehicle after resolution of the reason for the initial stop, the [police] officer's show of authority may constitute an investigatory detention subject to a renewed showing of reasonable suspicion.

***Commonwealth v. Mattis***, 252 A.3d 650, 655 (Pa. Super. 2021) (citations omitted); *see also* ***Ross***, 297 A.3d at 793 (stating, "allowing police officers to control all movement in a traffic encounter is a reasonable and justifiable

step towards protecting their safety" (ellipsis omitted) (*quoting Commonwealth v. Pratt*, 930 A.2d 561, 567-568 (Pa. Super. 2007), *appeal denied*, 946 A.2d 686 (Pa. 2008)); *Commonwealth v. Wright*, 224 A.3d 1104, 1109 (Pa. Super. 2019) (stating, "when [a police] officer detains a vehicle for violation of a traffic law, it is inherently reasonable that he or she be concerned with safety and, as a result, may order the occupants of the vehicle to alight from the car" (citation and original quotation marks omitted)), *appeal denied*, 237 A.3d 393 (Pa. 2020).

A police officer "may ask the detainee a moderate number of questions to determine his [or her] identity and to try to obtain information confirming or dispelling the [police] officer's suspicions. To that end, for their own safety, [police] officers may ask drivers whether they have a weapon or anything concerning as a matter of course during a traffic stop." *Ross*, 297 A.3d at 793 (citations and original quotation marks omitted).

"So long as the initial detention is lawful, nothing precludes a police officer from acting upon the fortuitous discovery of evidence suggesting a different crime than that initially suspected[.]" *Graham*, 353 A.3d at 232 (original quotation marks omitted), *citing Commonwealth v. Hicks*, 208 A.3d 916, 927-928 (Pa. 2019), *cert. denied*, 589 U.S. 1117 (2019). In other words, "a police officer may use information gathered during an initial [lawful] traffic stop to justify a second investigatory detention[.]" *Sloan*, 303 A.3d at 164, *relying on Commonwealth v. Galloway*, 265 A.3d 810 (Pa. Super. 2021), *appeal denied*, 284 A.3d 870 (Pa. 2022). The "new investigatory

- 10 -

detention," however, must be supported by independent reasonable suspicion. **Sloan**, 303 A.3d at 164.

"Importantly, not all inquiries during a traffic stop qualify as ordinarily incident to the stop's mission, as measures aimed at finding evidence of other crimes or safety precautions taken to facilitate detours from the mission do not pass constitutional muster." **Ross**, 297 A.3d at 793. Once a police officer ceases to make inquires in furtherance of the investigation for the traffic violation and begins "to obtain additional information unrelated to the initial traffic stop," then the police officer has effectively ended the investigation of the traffic stop and has initiated a new investigatory detention that must be supported by independent reasonable suspicion. **Mattis**, 252 A.3d at 656; **see also Sloan**, 303 A.3d at 164.

In examining the different types of conversations that may occur between a law enforcement officer and a citizen during a traffic stop, we find insightful the recent decision by United States Court of Appeals for the Third Circuit. In **United States v. Ross**, 151 F.4th 487 (3rd Cir. 2025), the Third Circuit Court of Appeals summarized the four categories of "roadside questioning" that typically occur between citizens and law enforcement during routine traffic stops and whether, or not, each of these categories of "roadside questioning" is tolerated by the Fourth Amendment, as follows:

> 1. *Small Talk*: The first category is pure small talk, encompassing anodyne conversation that carries no constitutional significance and instead simply rides sidecar to the [traffic] stop's mission. This encompasses common greetings and courtesies, including in the form of questions. [Examples include] "pleasantries about the

- 11 -

weather" or innocuous compliments like "nice [Steeler's] jersey," [and] have no constitutional significance. Such social graces are neither investigatory in nature, nor do they meaningfully prolong the stop. They are customary cultural expectations and practices. Nothing in the Constitution requires [police] officers to behave like robotic "automatons" or demands "stony silence" on the side of the road. So long as small talk occurs in the flow of the stop, it poses no Fourth Amendment problem.

2. *Infraction-Related Inquiries*: The second category includes questions aimed at assessing whether the driver is legally on the road and processing the ticket. This includes, among other things, requests for [driver's] license, [vehicle] registration, and proof of insurance; questions about the traffic infraction; and context-framing inquiries about the driver's travel history and plans. Even if some of these stop-related questions might incidentally reveal more than the [police] officer bargained for, they remain "ordinary inquiries incident to the traffic stop" and thus squarely on-mission under ***Rodriguez***.

Employment questions may fall in this category, depending on context. [F]or instance, [a police] officer can ask "questions about the driver's occupation" to assess a driver's sobriety during a DUI stop. Other observations or the context of preceding conversation might also render such inquiry unremarkable. [F]or example, if a driver volunteers that he [or she] is traveling for work, asking the driver "about what he [or she] does for a living" falls "comfortably within the bounds of reasonable follow-up questions."

3. *Safety-Related Inquiries*: Officer and roadway safety is mission-critical. So questions related to officer safety are related to the traffic stop's mission. Questions directly tied to officer safety, such as asking the driver whether there are any passengers in the car or if he [or she] has any weapons on him [or her], are always permitted on officer-safety grounds. The same is true of brief, direct questioning about the driver's past arrests, criminal record, or parole status - asked before the officer conducts a computerized criminal history check - because knowing a driver's criminal background helps officers assess potential risks involved in a traffic stop and gauge what additional precautions may be necessary.

But direct questioning is not the only safety-driven dialogue permitted by the Fourth Amendment. Brief, casual questioning aimed at gauging risks or deescalating a situation may also qualify

as reasonable precautionary measures during traffic stops to ensure the safety of officers and others.  Picture a late-night stop: a lone officer, a jittery driver whose hands tremble on the wheel, and an anxious passenger peering from the backseat.  Reading the social cues in the moment, an officer might reasonably decide that immediately ordering the driver out of the car or demanding to know whether he is armed would ratchet tension up, not down, and that a few low-stakes, rapport-building questions - "Long day at work?" "Nice pickup; how long have you had it?" - would do more to calm nerves and keep everyone safe.  Plus, that kind of safety-related small talk allows for observation of a speaker's coherence, agitation, and impairment - important clues pertaining to safety that give the solo officer a read on whether more direct precautions are needed.  Therefore, depending on the circumstances, a few easygoing questions can fall squarely within *Rodriguez*'s allowance for negligibly burdensome precautions.

In sum, when asked out of an interest to protect officers and supported by objectively reasonable safety concerns some questions that appear on their face unrelated to safety, including employment questions, may nevertheless fall within this category of permissible safety-promoting inquiries.

4.  *Off-Mission Inquiries*: Questions that cannot be reasonably characterized as relating to roadway safety or the traffic violation fall within the fourth category, which includes inquiries designed to facilitate on-scene investigation into other crimes and to detect crime in general or drug trafficking in particular.  Although our objective inquiry under *Rodriguez* is context-dependent, certain questions would hardly serve any other purpose.  [For example,] "Do you have any counterfeit merchandise?" and "Have any dead bodies in your car?" were fairly obviously [and] precisely the type of questions *Rodriguez* prohibits[.]

Conversely, depending on the facts of a stop, a question that appears off[-]mission on its face may in fact promote safe completion of the stop and thus relate to the stop's mission.  [For example,] an officer's single question near the beginning of the stop - "Is there anything illegal in the vehicle?" - was best understood as an inquiry about whether there was anything dangerous in the vehicle and thus related to officer safety and the traffic stop's mission because, in that context, it was asked by a solo officer, who was "outnumbered" during a late-night stop in a high-crime area, and both occupants exhibited "abnormal" behavior.  [By comparison, an officer] asking [a] driver "[Is] there

- 13 -

[ ] anything illegal in [the vehicle?]" 20 minutes into the stop after the citation was processed and when [the] driver should have been free to go was [an] off-mission inquiry[.] In short, context matters when assessing roadside questioning.

. . .

To be sure, off-mission questions designed to uncover unrelated criminal conduct are nevertheless permitted [under **Rodriguez**], even without reasonable suspicion, when they do not meaningfully lengthen the roadside detention. This situation may arise when the investigatory questioning occurs simultaneously with tasks that fall within the mission of the traffic stop, such as when an officer is multitasking or where one officer expeditiously completes all traffic-related tasks while another officer makes the off-mission inquiries. But if the stop is meaningfully prolonged beyond the time it should reasonably take, the questioning violates the Fourth Amendment unless supported by independent reasonable suspicion.

**Ross**, 151 F.4th at 496-499 (original brackets, original ellipsis, some quotation marks, and case and record citations omitted).

In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his [or her] experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

**Sloan**, 303 A.3d at 164 (ellipsis omitted), *quoting* **Commonwealth v. Smith**, 917 A.2d 848, 852 (Pa. Super. 2007); **see also Graham**, 353 A.3d at 230. "Reasonable suspicion is dependent on both the quantity and quality of the information police possess prior to detaining an individual." **Commonwealth v. Jefferson**, 256 A.3d 1242, 1248 (Pa. Super. 2021), *appeal denied*, 268

- 14 -

A.3d 1071 (Pa. 2021). The police officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Jefferson*, 256 A.3d at 1248-1249, *quoting* *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "[T]he fundamental inquiry is an objective one, namely, whether the facts available to police at the moment of the intrusion warrant a man [or woman] of reasonable caution in the belief that the action taken was appropriate." *Jefferson*, 256 A.3d at 1248.

In granting Romanelli's *omnibus* pre-trial motion, the trial court stated,

There is no disagreement between the parties as to the legality of the initial traffic stop. Trooper Allen possessed probable cause to stop [Romanelli's] vehicle for a violation of [Section] 3313 of the Vehicle Code, driving in right lane. Trooper Allen lawfully observed [Romanelli] to have bloodshot, glassy eyes when Trooper Allen first had contact with [Romanelli]. Furthermore, Trooper Allen lawfully ordered [Romanelli] to exit his vehicle.

When Trooper Allen questioned [Romanelli] about his use of marijuana, Trooper Allen initiated an investigative detention independent from the summary traffic violation, to investigate suspected DUI. To lawfully do so, Trooper Allen needed a reasonable suspicion of criminal activity. The only legal basis Trooper Allen possessed at the time he questioned [Romanelli] about marijuana use was Trooper Allen's observation of [Romanelli's] bloodshot, glassy eyes. Such limited observation does not rise to the level of reasonable suspicion for purposes of conducting an independent DUI investigation. Other than [Romanelli's] bloodshot, glassy eyes, Trooper Allen did not point to any other indicia of suspected indicators of DUI to justify his questioning of [Romanelli] concerning marijuana use. As such, Trooper Allen did not possess a reasonable suspicion to believe [Romanelli] was operating a motor vehicle while under the influence of a controlled substance.

Trial Court Opinion, 4/25/25, at 5-6 (citations omitted).

At the *omnibus* hearing, Trooper Allen testified that, on June 26, 2024, while conducting a routine patrol, he observed Romanelli's vehicle traveling in the left lane of the northbound portion of Route 15 for approximately four miles. N.T., 4/15/25, at 6-7. Romanelli's vehicle was required to be positioned in the right northbound lane of the roadway for purpose of travel at the time Trooper Allen observed the vehicle because there were no other vehicles in the vicinity. *Id.* at 6. Trooper Allen subsequently initiated a traffic stop based upon his observations. *Id.* at 7.

Upon approaching the vehicle, Trooper Allen asked Romanelli for his driver's license, vehicle registration card, and proof of insurance. *Id.* at 8. Trooper Allen stated that Romanelli's eyes were "extremely bloodshot and glassy" and Romanelli looked like he was "high." *Id.* Trooper Allen also observed three other passengers in the vehicle. *Id.* Because of Romanelli's appearance – bloodshot and glass eyes and looking like he was "high" – and because of the three passengers in the vehicle, Trooper Allen asked Romanelli to exit the vehicle. *Id.* Trooper Allen stated that he "just wanted to separate [Romanelli] from the vehicle to ask him further questions." *Id.* Trooper Allen stated that he and his partner, Trooper Tamecki, "ran" the vehicle's registration through police databases while observing Romanelli's vehicle in the left lane of travel. *Id.* at 9. Trooper Allen further explained that, after initiating the traffic stop, Trooper Tamecki returned to the police cruiser with Romanelli's driver's license, vehicle registration card, and proof of insurance

document for the purpose to performing the standard checks in police databases on the validity of the documents. *Id.*

After Romanelli exited the vehicle, and while Trooper Tamecki still possessed Romanelli's driver's license, vehicle registration card, and proof of insurance document, Trooper Allen asked Romanelli if he had smoked marijuana. *Id.* at 9. Romanelli informed Trooper Allen that he had "smoked earlier [that same] morning." *Id.* Trooper Allen testified that, based upon his training and experience, he believed Romanelli's appearance and demeanor indicated that he was unable to safely drive his motor vehicle.[6] *Id.* Trooper Allen stated that "[b]ecause of [Romanelli's] admission of smoking [marijuana] and his bloodshot, glass eyes, [he transitioned the traffic stop investigation] into a DUI investigation." *Id.*

On cross-examination, Trooper Allen agreed that he did not perceive an odor of marijuana while interacting with Romanelli. *Id.* at 11. Rather, Trooper Allen reiterated that he asked Romanelli to exit the vehicle because his eyes appeared to be bloodshot and glassy and because there were three other

---

[6] Trooper Allen testified that, during his almost six-years of employment by the Pennsylvania State Police, he participated in approximately 300 DUI-related traffic stops, of which "more than half" involved marijuana use. N.T., 4/15/25, at 5. Trooper Allen stated that his background included attending the Pennsylvania State Police Academy, as well as receiving standard field sobriety and advanced roadway impaired driving enforcement training. *Id.* Based upon his training, Trooper Allen explained that some of the indicators he looked for to determine whether, or not, a person was under the influence of a controlled substance included bloodshot, glassy eyes, pupil constriction/dilation, swaying, and odor of drug use. *Id.* at 6.

individuals in the vehicle at the time of the traffic stop. *Id.* at 11-12. Trooper Allen agreed that, prior to asking Romanelli to exit the vehicle, the bloodshot, glassy nature of Romanelli's eyes was the only indicator he perceived of suspected impairment. *Id.* at 11. Trooper Allen stated, "I asked him out of the vehicle to separate the parties. And then[,] I asked him immediately if he had been smoking marijuana [that] morning based off [the appearance of] his eyes." *Id.* at 13. Trooper Allen confirmed that, after Romanelli exited the vehicle, he did not ask Romanelli any questions pertaining to the traffic violation. *Id.* Rather, after Romanelli admitted to smoking marijuana earlier that morning, Trooper Allen asked Romanelli when he smoked marijuana and "how he smokes marijuana, bowl, bong, whatever" and then he "transitioned that into a DUI investigation." *Id.* at 14-15. Romanelli informed Trooper Allen that he smoked marijuana at 7:30 a.m. on the morning of the traffic incident and that he used a "bowl" to smoke the marijuana. Trooper Allen further confirmed that, while he was questioning Romanelli, Trooper Tamecki was verifying the validity of Romanelli's driver's license, vehicle registration, and vehicle insurance coverage in police databases. *Id.* at 14.

Upon review, we concur with, and the record supports, the trial court's finding that Trooper Allen had probable cause to conduct a lawful traffic stop of Romanelli's vehicle. Trooper Allen observed Romanelli operating his vehicle in the left lane of travel for approximately four miles in violation of Section 3313(d)(1). We further concur, and the record supports, the trial court's conclusion that Trooper Allen was permitted to order Romanelli out of the

vehicle for safety purposes. *See Mattis*, 252 A.3d at 655 (stating, "[o]ur Supreme Court has expressly recognized that an officer conducting a valid traffic stop may order the occupants of a vehicle to alight to assure his [or her] own safety"). As Trooper Allen stated, one of the reasons for removing Romanelli from the vehicle was because there were three additional passengers in the vehicle at the time of the traffic stop. For his safety, and the safety of Trooper Tamecki, Trooper Allen was permitted to have Romanelli exit the vehicle while Trooper Tamecki reviewed Romanelli's driver's license, vehicle registration, and vehicle insurance coverage. While Trooper Tamecki was performing the standard checks on Romanelli's documents and without prolonging the duration of the traffic stop, Trooper Allen asked Romanelli if he had smoked marijuana earlier that same morning, to which Romanelli responded that he had smoked marijuana, *via* use of a bowl, approximately 90 minutes prior to the police encounter.[7] We find that Trooper Allen's questions to Romanelli regarding his marijuana use were conducted during the mission of the traffic stop because Trooper Tamecki had not concluded his check of Romanelli's driver's license, vehicle registration, and insurance coverage in police databases and returned the documents to Romanelli and the questioning did not extend the length of the lawful investigative detention.

---

[7] Romanelli indicated that he possessed a medical marijuana card issued by the State of Maryland in support of his prior smoking of marijuana. We note that the Pennsylvania Medical Marijuana Act does not permit an individual to smoke medical marijuana. *See* 35 P.S. § 10231.303(b)(2)(iv).

Moreover, we find that Trooper Allen was permitted to ask Romanelli about his marijuana usage for safety reasons. Trooper Allen described Romanelli's appearance as "being high" and questions pertaining to marijuana use relate to a law enforcement officer's concerns regarding an individual's potential for harm to others. Trooper Allen's questioning of Romanelli about his marijuana use did not initiate a separate investigative detention under the facts presented in the case *sub judice* and, therefore, did not require Trooper Allen to have independent reasonable suspicion that Romanelli was engaged in criminal activity prior to initiating his questioning.[8] As such, we conclude that

---

[8] We are cognizant of this Court's decision in **Commonwealth v. Lomax**, 273 A.3d 1049, 2022 WL 439087 (Pa. Super. filed Feb. 14, 2022) (unpublished memorandum) in which this Court concluded that "when [the law enforcement officer] ordered [Lomax] to exit the vehicle[, after he initiated a traffic stop based on a broken taillight,] and began questioning [Lomax] about the smell of marijuana, he initiated a [new] investigative detention [requiring independent reasonable suspicion that criminal activity was afoot]." **Lomax**, 273 A.3d 1049, 2022 WL 439087, at *4. We find this case distinguishable, however, because the law enforcement officer in **Lomax** did not indicate that he ordered Lomax to alight from the vehicle for safety reasons or that he questioned Lomax about his use of marijuana during the mission of the traffic stop. **See generally**, **id.** Instead, the law enforcement officer asked Lomax, who was the sole passenger in the vehicle, to exit the vehicle so he could perform field sobriety testing and, while Lomax produced his driver's license at the initiation of the traffic stop, the law enforcement officer did not indicate that at the time of questioning Lomax about marijuana use that he still possessed Lomax's driver's license in furtherance of the mission of the traffic stop. **Id.** at *1. The law enforcement officer repeatedly questioned Lomax about using marijuana thereby extending the duration of the traffic stop. **Id.** at *4. In the case *sub judice*, Trooper Allen asked Romanelli to exit the vehicle for safety concerns, and his subsequent questioning of Romanelli about his

the trial court erred in granting Romanelli's *omnibus* pre-trial motion to suppress the evidence gathered as a result of the lawful traffic stop.[9]

Order vacated. Case remanded. Jurisdiction relinquished.

President Judge Emeritus Bender joins this Memorandum.

Judge Bowes concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 06/30/2026

_____

use of marijuana was out of safety concerns and in furtherance of the mission of the traffic stop and did not prolong the lawful traffic stop.

[9] Based on the observation of Romanelli's bloodshot, glassy eyes, his appearing "high," and Romanelli's admission that he smoked marijuana 90 minutes prior to operating his vehicle, Trooper Allen had reasonable suspicion to detain Romanelli beyond the mission of the traffic stop for the purpose of conducting field sobriety tests based on a suspicion of DUI. **See Commonwealth v. Coles**, 348 A.3d 256, 264 (Pa. Super. 2025) (stating, information learned before the mission of the traffic stop was satisfied is relevant to a reasonable suspicion analysis to support a new investigative detention).